The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Please be seated. That's fine. Our third and final argument this morning is 25-1058. Byers v. Painter. Ms. Seifert. May it please the Court. I would like to thank the Court first for the order that you issued to Council asking us to be prepared this morning to discuss the implications of the Barnes v. Felix case as well as the Benton v. Layton case. And I appreciate having the opportunity this morning to have a dialogue with the Court about those particular cases. In May of this year in Barnes v. Felix, the United States Supreme Court reexamined the standard to be applied by courts when resolving Fourth Amendment excessive force claims. In that case, the Supreme Court expressly rejected the use of the moment of threat rule because it prevents the attention to context that the courts must analyze in Fourth Amendment matters. The Court said, the Fourth Amendment does not freeze the frame at the moment a trigger is pulled. It demands assessment of the officer's actions in light of the totality of the circumstances. A court is not permitted to narrow the totality of the circumstances inquiry to focus on only a single moment. It must look, too, at any relevant events coming before. In this case, the district court did exactly what the United States Supreme Court in Barnes said was legal error. In this case, the district court focused solely on the moment that force was used, the very three seconds that Corporal Painter discharged his firearm and not a second before that. When we give careful attention to the facts and circumstances relating to the encounter, as required by Barnes v. Felix and Graham v. Conner, the following undisputed facts inform the reasonableness of Corporal Painter's use of deadly force. Before you get into that, Ms. Seifert, why is it that we should do this analysis? Obviously, we're compelled to regard exactly what to do in light of the Supreme Court's new instructions on how to look at these cases, but why isn't it first up to the district court to figure that out and then for us to review that decision? Yes, Your Honor, a couple of things. One, this is a qualified immunity matter, and under U.S. Supreme Court precedent, including Mitchell v. Forsythe, we know that it is important to resolve immunity at the earliest possible time in a case. It's not a defense on the merits. It's an immunity to the suit. So one of the reasons is we are here on motion to dismiss, and the material facts are settled. The court only has to look at the amended complaint, which includes the body-worn camera video, to determine those facts. So there's not a disputed fact or any other sort of issues that have been presented through discovery that this court would need to review. So while the court, of course, does have the authority to remand the matter, it is appropriate to decide on motion to dismiss, even though the standard was applied erroneously by the district court. So are you asking us then to apply the Graham factors? Yes, Your Honor. In the context of a harmless error analysis. Your Honor, it's not a harmless error analysis. It's a de novo review on qualified immunity on this motion to dismiss. So on this de novo review, what we are asking the court to do is look at the amended complaint and the body-worn camera video that was a part of the amended complaint, taking those facts from the perspective of an objectively reasonable officer on scene, and determine whether or not Corporal Painter is entitled to qualified immunity. And as the court knows, there's two different prongs for qualified immunity. The first is whether or not the conduct of the officer was objectively reasonable and did not violate a constitutional right. And the second prong of qualified immunity is, of course, whether or not the right at issue was clearly established, because officers are only held liable for violating a clearly established right. In this case, what we're asking the court to do is truly what the Fourth Circuit Court of Appeals has always done. Consider the totality of the circumstances. What the district court did in this case, considering solely the moment of force, is not consistent with what this court has done in Fourth Amendment use of force cases in the past. Right, so obviously we accept all of that is true, but there are circumstances and then there are circumstances. And obviously the moment that force is used is not irrelevant. Frankly, looking at this video, at least it seems to be pretty critical exactly what the officer was thinking when he decided to fire. And of course, we don't have any testimony from the officer. We only have the complaint and the allegations of the complaint. So walk me through why you think the circumstances leading up to the shooting justified the officer acting at the time that he decided to act. Yes, Your Honor, of course. And as the Barnes court said, we don't put chronological blinders on the timeline of the totality of the circumstances. So we start at the beginning for the context, the historical context of this encounter with the nature of the police response. There were two 911 calls that there were reported breaking and enterings into two homes and one vandalism to home. And then it was relayed that the suspect had entered another neighbor's garage. So arriving on scene, the officers have the context of two breaking and enterings and a vandalism, which we know from Fourth Circuit precedent, for example, in Rambert, is sufficient to make officers aware that there is dangerous conduct afoot. In addition, when the officers responded, both officers were in uniform. It's seen on the video that their uniforms display them as police. The female officer is also in a marked police vehicle displaying that she is Chesterfield County Police. This is also important and critical to the context because in Fourth Circuit precedent, the court has always considered was the officer readily recognizable as law enforcement or did they otherwise announce themselves? So in this case, when they're responding to the calls, they are identifiable from their uniforms and the vehicle as law enforcement. Do you have any Fourth Circuit precedent, though, to bring to our attention? Any case where the individual was backing away from the police and then turned running away and the police nevertheless shot him in the back. Do you have any cases like that that suggests that use of force is reasonable under the totality of the circumstances, that you can shoot somebody in the back who is running away from being apprehended for an attempted burglary? Your Honor, there is no case that squarely governs that fact scenario. Right, but do you have any cases that involve police shooting somebody in the back when there is a nonviolent crime that they have been responding to? At burglaries, no doubt, are very serious, but they're responding to a nonviolent crime. Well, actually, Your Honor, under Virginia Code 18.290 and the code sections that immediately follow, the crimes at issue here are actually considered violent offenses under Virginia law. Well, it's a daytime burglary, yes? Yes, ma'am, it is a daytime burglary, but the suspect is armed with a deadly weapon. He's carrying a hatchet and he's exiting the home with a hatchet. You're right, but he was running away from the police when he was shot in the back. At the moment that he was running, he's a fleeing felon, which under Tennessee v. Garner. Then you have a right to shoot someone in the back when they're running away, you're saying? Your Honor, yes, under Tennessee v. Garner. However, in this case, back to the first part of your question, Judge Keenan, in Carraway, a recent Fourth Circuit case by this court, the suspect in Carraway was taking a few steps backwards prior to the shooting. Now, it wasn't the one second beforehand, but it was in the few seconds immediately before the shooting. In this case, the suspect is walking backwards towards an intersection and towards Holmes. And I do want to back up for a second because we've skipped some context there. The suspect emerges from the garage. So wasn't it the case in Carraway that the individual in that case appeared to be raising the weapon at the time that officers shot him? This was a firearm, not a hatchet. He was reaching into his jacket to retrieve something, wasn't he? That's correct, Your Honor. He was following the commands that had been given to drop the weapon. And the officers in Carraway had assumed that the weapon was in his hand. It was a phone in his hand, not a weapon. And when the suspect went to reach into his pocket to pull the weapon out, that's when the officers shot. In all of the Fourth Circuit precedent, it has been very important to this court that the officers are recognizable as law enforcement and that they give clear and consistent commands. And in this particular case, after the suspect has the hatchet in hand and turns and walks into the street, the officers have been giving clear and consistent commands to drop the weapon. And instead of dropping the weapon, the suspect looks at Corporal Painter and says, Is that a big enough gun? And then starts walking backwards with his focus on Corporal Painter as well as the citizens that are standing behind him. And they continue to give verbal commands to put it down. And the suspect does not comply. These are not ambiguous commands. And the suspect continues to hold the hatchet. And he's not holding the hatchet dangling out to his side. He's holding it like this. He's holding it in a threatening position. This is a hatchet that can be used at any moment. It's not like a gun where you have to consider in Franklin, are they holding the barrel of the gun down or is the muzzle pointed down? This is a hatchet that can be thrown and used at any time. Go ahead. In terms of reasonableness, why doesn't Wilson versus Prince George's County resolve that? You had a lot more compelling facts in that case. It seems to me the officers are responding to the breaking and entering and assault. He was suspect was holding the knife and moved toward the officer, which Mr. Byers was not doing. That's correct, Your Honor. So why doesn't Wilson versus Prince George's County, in which we said that the use of force was unreasonable, we later resolved it on a clearly established prong. Yes, Your Honor. But we said that it was unreasonable. Why doesn't that establish the unreasonableness of the officer's conduct of shooting somebody in the back? So the facts in Wilson are dramatically different from the facts in the case at hand when you consider the weapon and how it was used and the threats made. There were no verbal threats towards the officers in Wilson. In this case, we have the questioning of the big enough gun, and then two to three seconds before the deadly force, the suspect looks at the officer and in response to him saying, put the weapon down, the suspect says, come get it. But then the officer started shooting. Yes, Your Honor, after the head turn. And the defendant—I don't want to say defendant, excuse me—and Mr. Byers then turns and runs. See, I mean, for purposes of argument, let's concede the first shots to your position. But I don't see how you get over shooting somebody in the back. Your Honor, the shooting occurred all in three seconds. In Carraway, this court said, the Fourth Circuit said it was not going to parse a three to four second time frame because of the idea that the officers are responding in tense and uncertain and rapidly evolving environments. And I would like to go back to Judge Keenan Wilson. In the Wilson case, the facts were that the suspect had stabbed himself in the chest and slid his own throat and had asked the officers to leave so that he could do what he wanted and kill himself in front of his girlfriend. Here we have a suspect with a hatchet who the only individuals that he's wanting to engage with are the officers, and then there's the individuals behind him. There is no indication here that he wants to harm himself. His threats to the officers, come get it, are not like Wilson. When you watch that video, it's quite clear that this unfortunate person, he was disoriented. His family, we have from the record that his parents lived nearby. He was wandering around. Obviously, he was breaking the law and a serious crime. But how does that then permit the police officers to do what they did? Your Honor, it's because the information is based on what the officers knew at the time, what an objectively reasonable officer on scene would consider. And what the parents were going through, where they lived, that was not part of the record as to what these officers knew. They responded to a breaking and entering call times two, a suspect with a hatchet who's ignored 15 commands. They tried the less than lethal force of the taser, and still he did not drop the hatchet. What message is conveyed to an officer other than this hatchet may be used against you by a suspect who does not drop it in the face of law enforcement and 15 commands, and then raises the hatchet, lowers it, twice says, come get it, in turns. When you say raises it, he wasn't raising the hatchet so the blade was up. He was essentially moving his arm and elbow. No, Your Honor, the video shows it like this. And that screenshot is in our brief. How far did the hatchet get up then? Like this, Your Honor. OK. But a hatchet doesn't have to be raised to be thrown or used. That's part of what is very different about this case than any other case that the Fourth Circuit or the U.S. Supreme Court has looked at is the type of weapon. Because if it was a gun. So let me ask about that and something related to that. Is it your position that the officers would have been entitled to use deadly force at any point in this encounter? Yes, sir. Right from the very beginning? Yes, sir. Well, from the moment that the officers were out of their vehicle and the suspect had the hatchet and he walks into the street and has already defied commands, at that moment, that was a deadly force encounter. And the only thing that occurred between that moment and the time that deadly force used was an escalation of conduct. Insofar as the comments that Mr. Byers made to the officers, the failure to drop the weapon after 15 commands and a taser deployment, and then the comments that he made raising the hatchet, repositioning it out to his side. The officer saying, put it down. And he says, come get it. And then he turns his head. And in Slattery v. Rizzo, this court said the turning of the head is a movement that can indicate that the threat is coming. So under those circumstances, immediately following those four seconds of conduct, Corporal Painter used deadly force based on an objectively reasonable perception that Mr. Byers was a threat with the hatchet. And then what was the objective reason to shoot him in the back three times after he was running? Your Honor, the suspect was running with the hatchet in hand and was still a threat not only to the officers, but at that moment, he's also running towards the home and the intersection. He was still a threat to the officer? How many times has he been hit? Three times? And then he turns, he's still running, and you shoot him in the back? Your Honor, he ran for five seconds with a hatchet in his hand. He was still a threat. He was dying. That's not what it appears on the camera when he's running with the hatchet in hand. He's still running towards the homes. And in that case— He was running up the street. Your Honor, I see that my time is up. May I finish answering your question? Absolutely. Yes. Your Honor, in Plumhoff v. Ricard by the U.S. Supreme Court in 2014, the court said that when someone is reengaging in conduct to flee, like they did in Plumhoff, that there is a public safety risk in that moment because of what the context is that they know about the prior parts of the call. So in this case, the attempts to break into homes and having the hatchet, when he takes off running, there is still a grave public safety risk to those residences in the immediate area of the suspect with the hatchet. Okay, but the complaint itself doesn't refer to bystanders. You and other residents, you do place some emphasis on that in your brief. But don't we have to look in this case to the complaint and to the video? Yes, Your Honor. I don't see any bystanders. They're on the video, Your Honor. Where? On the video. I can pull that up for you if I may. Okay, but I don't want to use your time now. There's individuals cutting the grass on the right-hand side of the officer's video when they first arrive on scene, which you can see. Right, but at the time of the shooting, where were the bystanders? There were the individuals in the home. When the shots were fired, we actually see people on the video? No, Your Honor. As the officers are giving commands, you see the individual cutting the grass. And then when Corporal Painter turns and is rendering aid, you see the three people that are on the video. You see the three people that are in the street. It's actually one second before the video that Mr. Curley submitted ends. You can see the three individuals that are standing back where the officers' vehicles are that had been observing the conduct. So those individuals— And that was—was that in the direction that he was running? No, he was running towards the houses on Atkins— He was running the other way, right? Yes, Your Honor. He was running towards the houses on Atkins Road. Yes, Your Honor. I see that my time is up. Thank you very much. Mr. Curley? May it please the Court? Paul Curley here on behalf of Margaret and Michael Byers. Your Honor, I think your questions that you've asked have squarely hit the nail on the head. Chesterfield County, the attorneys here in this case, truly believe that what Officer Painter did is okay under the law. They truly believe that. And I think this is how they are training their officers. They're training their officers that it's not necessary if somebody has a weapon to make a furtive or threatening movement. It's not necessary. You can shoot them anyway. If they don't listen to you, shoot them. And this has come out in the questioning that this panel had of counsel. They believe that at any time during this encounter with Mr. Byers that it was perfectly fine that the officers gunned him down in the street. The Tennessee v. Garner case that Judge Keenan brought up. It's crystal clear that there has to be a threat to the officer in order to shoot him, to shoot the suspect. Counsel believes that Mr. Byers, who had already been shot, turned around and Officer Painter pauses, pauses, aims, puts two bullets in his spine, killing him. That's okay in Chesterfield County. It's okay to shoot somebody who's not a threat to the officers. And this is the problem, is that Chesterfield County is training its officers that this behavior is okay. And that's why we have this problem. Okay, but we're here on the qualified investigation. I understand. Yes, ma'am. And we have to talk about whether the use of force was unreasonable. Yes, ma'am. And whether the right, if there was a right, was it clearly established? Yes, ma'am. So if you could keep us informed.  If you parse through counsel's argument, what they're asking this court to do in this interlocutory appeal is to second guess the analysis of the record that was done by the district court. Which, of course, this court can't do under the longstanding precedent in Johnson v. Jones. The court can't do that. And this court has to take the record as it was given to them by the district court. And here's what the district court found. The allegations of the amended complaint viewed in the light most favorable to plaintiffs alone demonstrate that Officer Painter began to shoot at Mr. Byers despite a lack of provocation. Mr. Byers was not a threat to Officer Painter or anyone else, immediate or otherwise, when Officer Painter began shooting at Mr. Byers. Exhibit H, which is the body cam video, helpfully illustrates this critical moment. At the time that Officer Painter begins to shoot, Mr. Byers is backing away with both arms relaxed at his sides, holding the hatchet in one hand. Mr. Byers makes no movement toward the officer, and the hand holding the hatchet does not so much as flinch. So, Mr. Curley, obviously we need to consider that. That's very relevant. I don't dispute that. But now we've got the Supreme Court case that suggested that we don't start and stop there. We go back to the beginning of the encounter and decide whether those additional facts, or the district court, I suppose, in the first instance, whether those additional facts of record, undisputed facts, somehow make a difference. And what's your position on that? Well, I mean, there's no indication, if you read Judge Young's opinion, that he didn't consider all the facts. Well, but he recites all the facts. He went out of his way to say that the case law in the Fourth Circuit was different. He said, unlike other circuits, this circuit, at the time, considers only the moment right before the use of deadly force, and not anything that happened before. And so he said that explicitly, didn't he? He did after reciting all of the facts in the case and saying he considered all the facts. I'm sorry to interrupt you. Yes, sir. I think your position is that it doesn't matter. So tell me why.  And, in fact, this is a very interesting point, because Barnes versus Healy. Well, and if I could piggyback onto that, your opposing counsel, Ms. Siefer, seems to want us to resolve this today. And are you saying the same thing? Yeah. Yet I think it's pretty clear that, well, first of all, this is a de novo review. So exactly how Judge Young arrived at this decision to deny qualified amenity I don't think matters much anyway. However, let's look at Barnes versus Felix. Went up to the Supreme Court. 9-0. Went back. Well, seven or eight days ago, the Fifth Circuit affirmed it decided exactly the same way because there was a threat to the officer in the case. And they opened up and said it doesn't change anything. If there's a threat, then it's justified. If there's no threat, it's unjustified. I don't care how you mix it up. In fact, if you look back, and I've looked back at every single case, furtive movement cases, for lack of a better term. In every single case in which there is a furtive or threatening movement, qualified immunity has been provided. There is not a single case in the Fourth Circuit or the U.S. Supreme Court where there's no furtive movement that qualified immunity is given to the officer. And the district court's review of the record in this case, there was no furtive or threatening movement with the weapon. And so the law is crystal clear. It's been established for years. Wilson versus Prince George's County, certainly a case. Cooper versus Sheehan. Nibs versus Momford. Chief Judge, Diaz gave you his question and opportunity to give a framework in this case. The point is, the question was to you is that notwithstanding the moment that if you drew it back, is it your argument that it was nothing that would add anything that's a danger to the police officer? There's not a single fact that we're concerned about. They never should have shot him at any point. These are the cases where you draw back, for example, like 10 minutes before it happened, the person turned around wielding a weapon. And then they're still chasing him. And then they get out of our sight. And then later, he turns around furtively, and it's a stick of gum he pulls out and he's shot. Well, you can't say, oh, you shot him. No, you have to go back and say, yeah, 10 minutes ago, he pulled a gun while he was running. The point is that here, there's nothing in the record that would enhance. He walked across there with almost his skivvies. I mean, unlike he had a jacket. Barefoot. Barefoot, skivvies almost, a T-shirt. Comes out holding a hatchet. They're 25 feet away. As a matter of fact, he got further away from them. There's escalations. I mean, the police officer creeped on it. I'm not saying police officers shouldn't do that, but I'm saying that in terms of danger, is that your point? Yes, sir. And if you look at the moment of threat versus totality of the circumstances, where the moment of threat comes from, if you read all the cases, is basically to stave off the government-created threat, you know, that people are claiming, well, you know, the police didn't follow the protocol, and this is how they ended up in this situation. And that's basically, at least that's my reading of these cases, is that, and that was the issue in Barnes v. Felix. There was a question as to whether the police officer should have jumped on the hood of the car. That was the issue, you know. And so the plaintiff's attorney in that case who had brought the suit basically was alleging that, well, but for the fact that the officer jumped on the hood, we wouldn't be in this situation. And so that's what the moment of threat, that's where it came from, is so we don't question what the officer did before. So I was curious when that issue was brought up, because I just thought to myself, expanding the window doesn't help Officer Painter. How could it? Well, they were catching, they were trying to apprehend a fleeing felon. I mean, that's not, you know, just going after somebody drunk in public. Your Honor, and if you can. It's a fleeing felon with a hatchet, so that elevates it somewhat. I understand, but, you know, when Your Honor calls Charlie Byers a fleeing felon, the hair on the back of my neck stands up. He was a mentally ill person. The officers didn't know that. Well, Your Honor, they should have, frankly. Barefoot, confused, obviously confused, indecipherable speech, you know, asking the lady if he could have a glass of water. Once again, the officers didn't know that. I mean, I understand. I understand. You have to engage with the record, and frankly, the record is not at all unhelpful to you, but the reality is, as Judge Keenan pointed out, they are faced with someone who's suspected. And I totally understand. So engage with that. I have to be totally honest with you. When I first viewed this video, I wanted to see that. I mean, as you understand, this case started out, there were multiple defendants. You know, when I saw this video, I wanted to see something like that, just to make the case simpler. But here's the problem. From the very beginning, after the shooting, Chesterfield County's story was we shot him because he was wielding an axe, advancing on officers. That story was out there for more than a year. His parents believed that Charlie. But he clearly wasn't advancing. No. No. So the video comes out. We see the video. They file a motion to dismiss based on qualified immunity. The term furtive movement or threatening movement isn't brought up anywhere in there. The officer's interview, he doesn't mention a threatening movement of any kind. There was none. And the district court found that there was no furtive or threatening movement. And, again, there is not a single case in the Fourth Circuit, the U.S. Supreme Court, where a court has held that the officer is entitled to qualified immunity without the suspect making a threatening move. I mean, there are lots of cases where there's no weapon, and they make a threatening move and qualified immunity. I mean, I don't mean to simplify it this much, but it's almost as if furtive movement qualified immunity. Okay. But I don't hear you emphasizing the fact that they then shot him in the back. Oh, yes, ma'am. I mean, that's. I'd like to hear from you on that. Yes, ma'am. Yeah, I mean, they certainly have a waterman versus baton problem. And the officers, there was a break in the sequence. There were four or five shots. Boom, boom, boom, boom. You can see on the video, Charlie turns around and shields himself, flinching. And the officer takes aim. There was a pause. Boom, boom, drops him. Fatal shot was in his spinal cord. We know that. We've alleged that. So even if the shooting was justified at any point, which it wasn't, it certainly wasn't justified to shoot the man in the back. And then you see on the video the dying on the ground, bleeding out. They hogtied him. They put his arms and legs behind his back while he's gasping for air. And this is fine in Chesterfield. It shouldn't be fine. It's not fine. And it's never been fine under any of the cases. Nibs, Cooper, I mean, any of them. In fact, the city of Tahlequah case, if that's how you pronounce that, the U.S. Supreme Court, recent U.S. Supreme Court case with the hammer. Again, hammer, furtive movement. He had the hammer over his head, and he was coming at the officers. But the issue in that case was not, you know, were the officers justified in shooting him. I think the issue there was that the officers hadn't followed protocol that got them into that situation. So, you know, if you look at the anyway. Can I ask you about the second prong of the analysis? And you've rattled off a number of cases that I think may be helpful to you on one or both. But what is the best case that you have that in the unique circumstances of the officer found himself here that it was clearly established that he could not use deadly force? Wow. I mean, I would say it's a collection of all of them. But Wilson versus Prince George's County, I would say, is pretty good. You know, a man with a knife. A man with a knife who was inflicting injury on himself. Only on himself. Right. So that's not really on all fours, is it? Well, I mean, it's not, but, you know. But he was moving toward the officers. So that's a little bit different. Yeah. You know, the nibs. I mean, there are just so many of them. Casella versus Hughes, I think, is pretty instructive. What are the facts of that case? That's the mentally ill woman had a large kitchen knife, moved towards her roommate, and was shot. The officer believed that she had taken a, you know, a threatening or furtive movement toward her roommate who was going to harm the roommate. Shot. So there was qualified immunity granted there? Yes. It went to the U.S. Supreme Court. That's not helpful. Well, I think it is, because you take away the furtive movement. And, I mean, that's the. I don't know that there. I mean, is it the law that an officer has to wait until a furtive movement occurs before he can use deadly force? Absolutely. What case says that? Nibs, Cooper. I mean, those are cases involving furtive movement. Hensley versus Price. You're not answering my question. Those are cases involving furtive movement. Does the court say it is required, as a matter of law, for an officer to see furtive movement before he or she can use deadly force? Yes, sir. Where does it say that? In just about every one of those cases. And I'll read it. The failure to obey commands by a person in possession of, or suspected to be in possession of a weapon, only justifies the use of deadly force if that person makes some sort of furtive or other threatening movement with the weapon, thereby signaling the officer that the suspect intends to use it in a way that immediately threatens the safety of the officer or another person. Clearly established July 2023. And Ms. Seifert points to the fact that Mr. Byers, in this case, was holding the weapon, she claims, at the ready. Absolutely untrue. Okay. It's on the video. And, again, so what she's asking, basically, is that you second-guess the analysis that Judge Young made of the video. You can't do that. Also, and second-guess what we could see for ourselves in the video. Right. It's there. I mean, for her to represent in this court that he had the hatchet like this is dishonest, Your Honor. Didn't happen. At the very most, at the very most, I think he looked at it. He turned it and looked at it. That's it. And I'm thinking to myself, what am I going to do 25 feet away with a hatchet like this that is a threat to anyone? What are you going to do with it? I mean, there's no threat. And any objective, reasonable officer would know that there's no threat. I mean, Chesterfield is trying to get this case dismissed at the motion-to-dismiss stage. They don't want to go through discovery. They don't want a jury to hear this case. So they want to get it knocked out like this. And the court can't do it because Judge Young has already established the record. You can't second-guess his interpretation of the video. And he says there wasn't a movement. I mean, just to add the emphasis, he said the hand holding the hatchet did not so much as flinch. Well, we conceded the video. I know. I know. And it's true. At the moment he's shot, he has the hatchet like this and his head's like this.  Of course not. When he's shot in the spine, his back is turned. He's like this.  No. No threat. Therefore, no qualified immunity. You can't have qualified immunity without a threat to the officer. I don't care what legal test you use. No threat, no qualified immunity. It's not any more complicated than that. Every single case, there has been an objective, reasonable threat to the officers. And I totally understand the use of force under those circumstances. Not these. Not these circumstances. There was no threat. I could go on and on. But if the court has any more questions, I'm happy to answer. Thank you, Mr. Carley. Thank you, sir. C for.  First, let me take a moment to address the comment that what I have represented to the court was not accurate and was not true. We have provided in our brief, and if you look at JA 158, 632 to 633, the very moment, three and a half seconds before the deadly force was used, the position of the hatchet. So the court is able to view it, of course. That is part of the record. On a de novo review, the court has the opportunity and ought to be looking at all of that context, as the court in Barnes has told us. The behavior of Mr. Byers observed by the officers on scene is what is at issue here. Noncompliance. That's what it was. Your Honor, it's noncompliance. And it's with a hatchet, a deadly weapon in hand, with the knowledge that two attempted breaking and enterings and a vandalism to home had already been completed. And Mr. Carley has conceded, citing Casella versus Hughes, that the law on this type of matter is not clearly established, because that's what the United States Supreme Court held in Casella. Qualified immunity because the law was not clearly established. It is clearly established. It doesn't have to be exact. That's why you don't have any cases like this where someone is shot in the back. In the back. And you get qualified immunity. Your Honor. Because it's obvious for the police officers, most of the people, I mean, common sense would be you don't shoot a person in the back after you've shot three times and then they're turning around, literally dying, and you shoot them again three times. Your Honor, Mr. Byers. Common sense would know that in terms of you can do that. Mr. Byers was still holding the hatchet at shoulder height when he was shot. In the Carraway case, there were three shots while the suspect was kneeling and 12 shots after he fell to the ground, laying prone. And in the Carraway case, this Fourth Circuit said it all transpired in three to four seconds, those shots. But there was a gun pointed at the officers when they opened fire on Carraway. And in this case, the police shot this man in the back. How do you get around that? Because, Your Honor, the officer starts firing as the suspect has got the hatchet in his hand and has just said, come get it, and turns. And then the suspect can go get it. And once he starts running away, turning, you have a right to shoot him in the back. Why? You've never answered that for us here today. Your Honor, he is a public safety risk, as the United States Supreme Court recognized in Plumhoff v. Ricard, when he chose to flee with the hatchet. But also, this happens in a matter of seconds. The shots fired all took place in three seconds. Three seconds that the officer has to perceive and react. In this case, it was three seconds. And when he turned, the officer believed there was a threat to him and then a threat to the others with the hatchet still in hand. This is not like Wilson, where the suspect is only a threat to himself. And, Your Honor, in the Wilson case, this court wrote how to clearly establish law. This court wrote specifically... But, Wilson, the suspect, even though he had injured himself, he was moving toward the officers with the knife. With a puck, yes, ma'am. With the knife. In this case, the decedent was not moving toward the officers. He was running away from them. Backing away. The whole time. He never was advancing. At the moment force was used, the officers were facing a suspect with a deadly weapon, a hatchet, which has never been considered by this circuit or the U.S. Supreme Court. And they used deadly force because they perceived reasonably that hatchet to be a threat. Why else did the suspect not drop the hatchet? What other perception is reasonable to an officer unseen when they've given 15 commands? The law is not clearly established on this point in the United States Supreme Court or by the Fourth Circuit on how to handle that situation. In Wilson, it was clear it was a stumbling suspect who stabbed himself. You know, we see this so often in our case law, in our cases that come before this court. I've been listening to these cases for a long time. And so often when somebody has a mental problem, and I know this record doesn't elaborate on that, but so often when you have somebody who is not without those kind of problems, the police don't know how to react. And it just screams out for more training in mental health situations. It absolutely does. That's aside from this case. But, you know, to the extent that you represent Chesterfield County, you may want to send that message back. Yes, Your Honor. I see my time is up. May I respond? Yes. Yes, Your Honor. I appreciate that. And this is, of course, a tragedy. And these officers were not aware of his mental health condition based on the record and the way that this occurred. And for the law to be clearly established, I'm going to wrap with a quote from Atkinson v. Godfrey. This court said, We do not decide whether a right is clearly established like a customer in a buffet line, selectively picking items and declining others to come up with the ideal meal. The reason for this should be clear. The second prong of qualified immunity examines if the law fairly warned an officer that his conduct violated the Constitution. Mixing and matching parts of dissimilar decisions does not provide the requisite fair warning. And, Your Honors, in this case, opposing counsel stood before you and said that there are a few cases that you can piece together that would clearly establish the law for this. Casella v. Hughes from the U.S. Supreme Court has said that the law is not clearly established in this type of situation. And for those reasons, we would ask that you reverse the decision of the district court and find that Corporal Painter is entitled to qualified immunity. Thank you, Your Honors. Thank you very much, Ms. Seifert. I want to thank both counsel for their arguments in this very difficult and emotional and challenging case. We'll come down and greet you and then go into conference. And then when we're done with our conference, we'll come back and entertain questions from the students at the law school. So, Madam Clerk. This Honorable Court stands adjourned. Signed, God Save the United States and this Honorable Court.
judges: Albert Diaz, Roger L. Gregory, Barbara Milano Keenan